IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DOROTHY ROSS, individually and as Surviving spouse of Elmer Ross, deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. CIV-10-1354-R |
| THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, a Delaware corporation, | ) ) ) ) | |
| Defendant. | ) ) | |

# ORDER

This matter comes before the Court on cross-motions for summary judgment, filed by the parties after the Court granted leave to address certain limited issues. Having considered Plaintiff's motion (Doc. No. 170) and Defendant Burlington Northern Santa Fe Railway Company ("BNSF")'s motion (Doc. No. 171), as well as the corresponding responses and replies, the Court finds as follows.

The facts underlying the dispute are well known to the parties and won't be repeated herein. The instant motions address whether the crossing at issue was public or private, a determination that the parties appear to agree will dictate the extent of the duty owed by Defendant to Plaintiff. That is, if the Court determines as a matter of law that the crossing was a private crossing, then Mr. Ross was a trespasser, and the only duty owed to him by the Defendant railroad would have been to avoid wantonly or willfully injuring Mr. Ross after his presence on the track was discovered. *See Atchison, T. & S.F. Ry. Co. v. Phillips*, 12 P.2d

908 (Okla. 1932). If, however, the Court determines that the crossing was public or that decedent was a licensee, Defendant's duty toward Mr. Ross increased. Specifically, if the Court finds Mr. Ross was a licensee Defendant would have been required to "maintain a lookout and to exercise ordinary care to prevent injuring persons whose presence on the track at this point might be reasonably anticipated." *Chicago, R.I. & P. Ry. Co. v. McCleary*, 53 P.2d 555, (Okla. 1935)(internal quotations omitted). Alternatively, the Court could find that the issue of whether the decedent was a licensee or trespasser is one for the jury. *See St. Louis & S. F. R. Co. v. Hodge,* 157 P. 60 (Okla. 1916).

Preliminarily, the Court must address certain evidentiary issues which may impact the outcome of the instant motions. Defendant contends that the Federal Railroad Administration Crossing Inventories related to crossing 014404L, where Mr. Ross was killed, are inadmissible pursuant to a federal statutory privilege, set forth in 23 U.S.C. § 409. Defendant also contends that certain accident reports created and submitted by BNSF to the FRA are inadmissible pursuant to 49 U.S.C. § 20903.

> 23 U.S.C. § 409 provides:
>
> Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

As with all evidentiary privileges, § 409 must be narrowly construed, *Pierce Cnty. v. Guillen*, 537 U.S. 129, 144, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003), and Defendant, as invoker of the privilege, bears the burden of establishing its applicability. *See In re Grand Jury Subpoena Duces Tecum,* 697 F.2d 277, 279 (10th Cir. 1983). The Third Circuit recently addressed both of the privileges asserted by Defendant in *Zimmerman v. Norfolk Southern Corp.*, 706 F.3d 170 (3d Cir), *cert. denied*, 134 S.Ct. 164 (2013). Furthermore the parties have not identified and the Court research has not unearthed any contrary Tenth Circuit authority that would preclude this Court from adopting the position set forth in *Zimmerman*.

As noted by the *Zimmerman* court, the dispositive issue is whether the National Crossing Inventories were collected pursuant to the sections of Title 23 specifically identified in § 409. In *Zimmerman* the plaintiff sought to use the inventories to establish that the track where the accident occurred was a Class 1 track. Herein Plaintiff seeks to rely on the inventories to establish that Defendant long believed and treated the crossing as public.

> The National Crossing Inventory is a database of highway-railroad crossings in the United States. The inventory contains reports on each crossing, which include information such as the number of trains that pass through daily, the typical train speed, and the maximum speed.

*Id.* at 180. Plaintiffs herein seek to rely on five reports related to the 014404L crossing, each of which indicates in the section for "Type and Position" that the crossing is "Public At Grade." The court in *Zimmerman* noted that § 409 can be divided into two distinct parts. Under the first, "reports, data and the like" are excluded "if they were compiled or collected to identify, evaluate, or plan 'the safety enhancement of potential accident sites, hazardous

3

roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148." *Id.* at 181 (quoting 23 U.S.C. § 409). "The second part exclude such documents if they were compiled or collected to develop 'any highway safety construction improvement project which may be implemented using Federal-aid highway funds.'" *Id.*

Defendant presents no evidence that the inventory reports were collected pursuant to any of the three identified sections. First, with regard to the one report generated after passage of the Rail Safety Improvement Act of 2008, the railroad's requirement to submit inventory information was codified in 49 U.S.C. § 20160, and the report upon which Plaintiff seeks to rely indicates the "Railroad" was the "Initiating Agency." Therefore, pursuant to *Zimmerman*, the report does not meet the criteria for the first half of § 409. With regard to the remainder of the inventories, all but one pre-date the 2008 Act, the Defendant has failed to establish how or why the reports were generated and submitted. With the exception of the first report submitted by Plaintiff, which indicates that the "Initiating Agency" is "original," the remainder indicate submission by the "Railroad." There is, however, no evidence from the Defendant in support of its burden that the inventories are inadmissible. As in *Zimmerman*, there is simply no evidence that the "immediate source of the documents — here, the Federal Railroad Administration — 'collected' them "pursuant to sections 130, 144, and 148 of [Title 23].' 23 U.S.C. § 409." *Id.* at 184[1]

---

[1] Defendant attempts to distinguish *Zimmerman* in its motion in limine by arguing that because the Oklahoma Department of Transportation representative testified that she relied on the FRA inventory in assessing the public versus private nature of the crossing when post-accident funds were to be expended to improve the crossing, that the inventories were compiled or collected for purposes of increasing the safety of the crossing, thereby invoking the § 409 privilege. The fact that Judy Dennis accessed the same

4

Furthermore, with regard to the second prong of § 409, *Zimmerman* adopted a narrow interpretation, applying the privilege only if "a report was collected for the statutory purpose if the agency collected it with the intent to use it for a particular construction project" *Id.* at 184. Again, in this action there is no evidence that any of the reports was submitted in conjunction with a particular construction project, although some indicate a "changed crossing" as the basis for the new report. Accordingly, Defendant has failed in its burden and Plaintiff is entitled to rely on these reports in pursuit of summary judgment and in an effort to avoid Defendant's motion.[2] Having made these determinations the Court turns to the issue at hand, the duty owed by Defendant to the decedent, which again, will be determined from consideration of the status of the crossing and/or Mr. Ross's status vis-a-vis the crossing, that is, whether he was a trespasser or entitled to some greater level or protection.

With regard to the formal status of the crossing, that is whether Carter Road at the crossing was formally a public road, and the crossing formally a public crossing, the Court concludes that despite the evidence that there was no public maintenance of Carter Road east of the western-boundary of the crossing, that the crossing was nevertheless public. Federal law defines a public railway crossing as one where "a public authority maintains the roadway

---

information as Plaintiff has now accessed does not transform the nature of the documents. The Court hereby rejects Defendant's characterization of the *Zimmerman* analysis as containing two fatal flaws. The failure to address pre-existing case law was irrelevant, as none of the cases cited by Defendant, was precedential in the Third Circuit. Second, the Court reject's Defendant's contention that the court in *Zimmerman* misappropriated the phrase "compiled or collected" and improperly concluded that it was modified by "pursuant to sections 130, 144 and 152 of this Title."

[2] The Court makes no findings regarding the admissibility of the remainder of the reports or whether the other accidents were sufficiently similar so as to be admissible.

5

on both sides of the crossing." 49 C.F.R. § 222.9.[3] The Oklahoma Administrative Code provides that a "'public crossing' means a location where the tracks cross a road which is under the jurisdiction of and maintained by a public authority and which is open to public travel." OAC 165:32-1-3. The evidence submitted by the parties establishes that Carter Road, at any point east of the western side of the tracks was not maintained by any public authority. The evidence of BNSF's treatment of the crossing, however, both pre and post-accident, however, leads the Court to conclude that BNSF treated the crossing as a public one, and this historical treatment supports a single conclusion, that the crossing is public, despite the absence of public funding to maintain Carter Road.

The Court's finding in this regard stems largely from BNSF's own records and actions, pre and post-accident, which indicate its belief that the crossing was public. The first Federal Railroad Administration inventory provided by Plaintiff indicates it was effective from 1970 until 1982, the "Initiating Agency" is "Original," the crossing is described as "Public At Grade." The inventory further indicates that the "Annual Average Daily Traffic" ("AADT") was 30 vehicles, and that 4% of those were trucks. A subsequent inventory sheet with effective dates of May 19, 1999 through January 20, 2000 states that the initiating agency was the railroad, the crossing was public at grade, and the AADT was maintained at 30 vehicles allegedly based on 1987 AADT data.

---

[3] Federal statute defines a "public road" as "a road . . . under the jurisdiction of and maintained by a public authority and open for travel." 23 U.S.C. § 101. Oklahoma statute defines the term similarly. Okla. Stat. tit. 69 § 232; *see also*, Okla. Stat. tit. 69 § 1201(A).

A subsequent inventory was filed with a "Begin-Date Record" of February 24, 2005, again listing the Railroad as the initiating agency. The type indicated was public at grade, although there was now an indication on the second page of the inventory that there was one crossbuck, as opposed to the two listed on all prior inventories, and this inventory indicated the existence of a sign that said "pvt xing." There is, however, no testimony or photographic evidence to support the existence of such a sign, no evidence regarding the location of any such sign, and Commissioner Goucher testified that heading east over the crossing there was no indication the crossing was private. The AADT was maintained at 30 vehicles per day, again based on 1987 values. This information remained the same in the subsequent inventories. Accordingly, there is evidence that this track, located in a remote rural area, was by BNSF's estimates being crossed by an average of thirty vehicles a day, and further, that BNSF considered the crossing to be public.

With regard to the decision to increase the track from single to double, which project was completed in 2005, Lewis Ruder, a BNSF engineer, testified that he had no personal knowledge about who was actually using the crossing as they prepared for the track increase. Ruder Deposition, p. 25. He testified that the information he obtained during reconnaissance led him to believe traffic use was minimal, but he concluded that BNSF could not close the crossing because "[i]t became obvious after looking further at the topographic maps and the landowner plats that we would landlock that property. . . . [I]t just didn't appear to be worth it, that we couldn't easily do that, to close the crossing." Tr. 62. He responded affirmatively when asked if it became obvious that someone had to use the crossing and testified that the

crossing "was showing on our track charts as a public crossing." Tr. 70. BNSF apparently made no additional inquiry into who or how many persons were actually doing so. Id. Ruder also acknowledged that there were "no other crossings in the double track project's limits west of the river other than the one indicated." *Id.* at 69. He testified that there was nothing in the file indicating that BNSF ever told anyone to stay off the road to the east of the crossing, where Mr. Ross had performed grading services prior to his death.[4] Id. at 137.

With regard to accident reports filed by BNSF, therein the company indicated the crossing was public, which is consistent with their internal records, specifically the Line Segment Map, which lists crossing 014404L as "PUB GR XING." Kamalah Young, a BNSF employee in the Public Projects Department, testified that she located a crossing file for the 014404L crossing in her department and did not contact the division governing private crossings, again supporting BNSF's treatment of the crossing as public.

Finally, although subsequent remedial measures are not admissible to establish negligence, BNSF's actions with regard to the placement of lights and gates indicates their treatment of the crossing as public. First, although Defendant contends federal money can be expended on non-public crossings, the Court concludes otherwise. *See A Guide to Federal-Aid Programs and Projects*, U.S. DOT, "Elimination of Hazards at Railway-Highway Crossings, Updated December 3, 2012 (With regard to projects under 23 U.S.C. § 130, "Eligibility: All at-grade public crossing safety improvement projects meeting the

---

[4] The Court acknowledges Defendant's contention that prior to the collision on the crossing Mr. Ross was trespassing on its right-of-way, the area east of the track. The Court does not find this fact dispositive of the nature of the crossing itself.

eligibility description in 23 U.S.C. § 130 are eligible for funding."). The Federal Highway Administration's website indicates that "The Section 130 program funds are eligible for projects at all public crossings including roadways, bike trails and pedestrian paths." W. David Smith, an ODOT engineer provided an affidavit in another railroad case, *Morris v. Union Pacific R. Co.*, Case No. C.V.-05-390-S (E.D.Okla.),wherein he stated that the Oklahoma Department of Transportation ("ODOT") lacks the authority to authorize the expenditure of federal funds on the installation of warning devices on private crossings. Judy Dennis, an employee of ODOT testified that her Department uses Section 130 funds for public crossings, and that with regard to this crossing, the DOT had concluded the crossing was public and it sought Section 130 funds. Furthermore, BNSF sought the approval of the Oklahoma Corporation Commission prior to initiating construction of the new warning system, representing therein the usage of § 130 funds, and its belief that the upgrade "is in the best interest of the safety for the traveling public and safe railroad operations."[5] Additionally, according to the evidence submitted by Plaintiff, BNSF participated willingly in the process of obtaining and expending federal funds for the crossing and cooperated with both the Department of Transportation and the Oklahoma Corporation Commission in the project, apparently never raising the issue. The Court also notes that Defendant vehemently argued in this case that the crossing had been upgraded pre-accident with federal funds, i.e.,

---

[5] Sherry Soliz of the Oklahoma Corporation Commission testified:
We have jurisdiction, as you know, over public at grade crossings. If the commission – I'm just speculating – if the commission were to hear an upgrade on a private crossing, more than likely, it would be to make it a public crossing.
Tr. 10-11.

that it was a public crossing, in an effort to invoke a defense of preemption. This evidence, when considered in total, establishes that the crossing at issue was public; it was treated by Defendant and Oklahoma governmental agencies as public, both before and after the accident, and the Court finds, as a matter of law that the crossing was public, and therefore, Defendant owed a higher duty of care to Mr. Ross.

Furthermore, even if the Court has improperly determined that the crossing was public for all purposes and Mr. Ross would ordinarily be entitled to the limited protection owed a trespasser, Defendant's treatment of the crossing effectively converted persons using the crossing into licensees. "We do not understand in cases of this class that it is incumbent upon the plaintiff to show that the road over which he was passing was a regularly created public road - that is, that the road was dedicated, laid out, and accepted in pursuance to some provision of law--in order to require that the railroad . .. otherwise exercise ordinary care toward persons using the same." *Midland Valley R.R. Co. v. Shores*, 136 P. 157, 158 (Okla. 1913). The court continued:

> There is abundant authority to the effect that a railroad crossing may not be upon a public highway, yet, if the track has been used by travelers as a public crossing for a long time with the knowledge of the company, and without objection, and the company has treated the same as a public crossing, it will be presumed to be such, and the railway will be bound to exercise ordinary care to prevent injuries to persons using the same.

*Id*; *see also St. Louis, I.M. & S. Ry. Co. v. O'Connor*, 142 P. 1111 (Okla. 1914); *overruled on other grounds by St. Louis & S.F. R. Co. v. Stacy,* 171 P. 870 (Okla. 1916).

Based on the same evidence set forth above, the Court finds that BNSF treated the crossing as public for a sufficient length of time so as to preclude the Court, or a reasonable jury, from finding that Mr. Ross was a mere trespasser on the tracks when he was hit and killed by the train. Beyond its representations to the federal and state governments, Defendant took no steps to preclude crossing by the public. In addition, BNSF was aware that crossing was being accessed by approximately thirty cars per day since the 1980's. Defendant was aware in its reconnaissance pre-2005 that someone was using the crossing, such that it could not be closed as part of the track upgrade process. Although Defendant had deeds for the road running parallel to the track on the east side that waived ingress and egress rights and eliminated access for oil and gas production, it apparently did nothing to enforce those rights, the road on the east side having been upgraded by some unknown entity. There was no gating, signage or attempt to keep the public from using the crossing, which the Court concludes in this case rendered Mr. Ross a licensee not a trespasser. As such, the Court finds as a matter of law that the crossing was public, not private, and Defendant's duty to Mr. Ross will be judged accordingly.[6]

Defendant also argues that the horn complied with both federal and state law, and argument with which Plaintiff does not take issue. Defendant then argues that "[n]either this Court nor the Tenth Circuit addressed whether the volume of the horn output was preempted as a matter of law, because at the time the prior orders were issued, there was no evidence on this point." The Court does not interpret the issue as remanded by the Tenth Circuit as addressing preemption. Rather,

---

[6] This conclusion obviates the need to address any argument by Defendant that it fully performed any duty owed to a trespasser.

regardless of the fact that the horn met federal and state volume standards, the Tenth Circuit concluded with regard to Defendant's statutory affirmative defense, that the issue is whether the horn was audible from Mr. Ross's position. Additionally, the Court cannot conclude based on the evidence submitted that as a matter of law the horn was audible to someone in the decedent's position, which is how the Tenth Circuit construed the relevant statute, a construction this Court is bound to utilize as it is law of the case.

Finally, Defendant argues that punitive damages fail as a matter of law because there is no evidence that its actions were wanton or reckless. The Court first notes that this issue is beyond the scope of the Court's permission for leave to file secondary motions for summary judgment. Furthermore, in light of the above rulings, the Court will defer ruling on the issue of punitive damages until such time as it has heard Plaintiff's evidence at trial.

For the reasons set forth herein, Defendant's motion is hereby DENIED, and Plaintiff's motion is GRANTED AS SET FORTH HEREIN.

IT IS SO ORDERED this 29th day of October, 2014.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE